# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | NO. CR-14-00304-HE |
| ) | |
| JORGE LUIS RODRIGUEZ, *et al.,* ) | |
| ) | |
| Defendants. ) | |

## ORDER

Defendants Jorge Luis Rodriguez and Jesus Emilio Chavira-Serrano were charged by indictment,[1] with conspiring to possess with intent to distribute and to distribute heroin in violation of 21 U.S.C. § 846. Defendant Rodriguez filed a motion to suppress, seeking to suppress evidence seized during a vehicle search and statements he later made when interrogated. Defendant Chavira-Serrano adopted defendant Rodriguez's motion. An evidentiary hearing was held regarding the motion on January 12, 2015. Having considered the evidence presented, the parties' briefs and the arguments of counsel, the court concludes defendant Rodriguez's motion should be granted and defendant Chavira-Serrano's motion should be denied.

### Background

At approximately 6:15 p.m. on August 22, 2014, Oklahoma City police officer Stanley McMullen was patrolling a high crime area in south Oklahoma City known for drugs, guns and prostitution. He noticed a man sitting in the front passenger seat of a white Toyota sedan

---

[1]Another defendant was charged, but he has not been arrested.

parked on Southwest 41st Street near south Robinson. The officer initially suspected the individual was engaging in an act of prostitution. While he determined that was not occurring when he passed by the car again and saw no other person in the vehicle, Sgt. McMullen decided nonetheless to speak to the person seated in the car. As part of his job, Sgt. McMullen was participating in the Viper program, which placed Oklahoma City police officers in the city's most crime-stricken areas and had them "make as many contacts" with the citizens as they could, "see what people are out doing, make sure they are not committing a crime." Hearing Transcript, Doc. #59, p. 34. Sgt. McMullen parked his vehicle, as did his partner, Sgt. Brown, who was in his own marked vehicle. He testified that either he or Sgt. Brown would have activated the lights on their vehicle "to let traffic know that we were in the middle of the street." Doc. #59, Hearing Transcript, p. 35.

Sgt. McMullen and Sgt. Brown approached the Toyota from the rear on foot. As they did so, the passenger, later identified as defendant Rodriguez, turned around and looked at them. According to Sgt. McMullen, he then made motions as if he were stuffing or hiding something around the center console area. Sgt. McMullen did not remember if their guns were drawn but testified that his hand probably was on his pistol. He knocked on the passenger window, which was closed, and asked Mr. Rodriguez if he wanted to talk to them. Rather than rolling down the window, Mr. Rodriguez opened the front passenger door. Sgt. McMullen asked what he was doing and Mr. Rodriguez said he was waiting on a friend who had gone to the auto shop across the street to pick up a vehicle. The entry to the shop was about 25 to 30 feet away from the parked car. Although most of the shops in the area had

closed by that time, the gate to the mechanic shop was open and Sgt. McMullen assumed the shop was open. Sgt. McMullen testified that he had been patrolling that area for about 11 years, but was not aware of any criminal activity associated with the mechanic shop.

Sgt. McMullen also asked for identification. Rodriguez did not have any, nor did he have a driver's license or other form of identification. He also did not give Sgt. McMullen a name. Because he was concerned about possible concealed weapons inside the vehicle, Sgt. McMullen instructed Mr. Rodriguez to keep his hands where he could see them, which Rodriguez did. Sgt. McMullen then asked Mr. Rodriguez if he would exit the vehicle. He agreed, stepped out of the car and left the passenger door open and the car running. Sgt. McMullen did not see anything illegal or suspicious in the vehicle.

Sgt. McMullen asked Mr. Rodriguez if he had any weapons on him. He said no and consented to a search of his person. During the pat down, Sgt. McMullen noticed that Mr. Rodriguez's hands were sweaty and shaking and his jaw bones were quivering. The officer found the shaking to be unusual because of the August heat.

Sgt. McMullen asked Mr. Rodriguez to go back with him to his scout car so he could obtain additional information about his identity. He put Mr. Rodriguez in the back seat of the scout car. The doors were locked. He then asked Mr. Rodriguez his name, address and date of birth and put that information into the City's VARUNA system, which the officer described as its bureau of records. As explained by Sgt. McMullen, if a person has ever been field interviewed in Oklahoma City or arrested or involved in a vehicle accident, his or her name will be entered in the VARUNA system. Sgt McMullen was not able to retrieve any

information about Rodriguez from the database. He testified that he had found nothing in the system that led him to believe Mr. Rodriguez was involved in illegal activity. He also ran a license check on the vehicle, but nothing illegal about it came back. At this point the driver of the Toyota still had not returned from the shop, but neither officer had gone to the shop to check out Mr. Rodriguez's story.

Sgt McMullen decided then to call for a drug dog. Approximately twenty to twenty-five minutes had passed since the officers' initial contact with Mr. Rodriguez. Sgt. McMullen testified that "[he] just felt uneasy at that point – about [the passenger's] actions." Hearing Transcript, p. 18. He was referring to the "[t]he actions of the passenger when [he] was approaching, possibly stuffing narcotics, weapons." *Id.* The officer also testified that he made the decision in part because of his inability to obtain more background information about Mr. Rodriguez's identity, his "failure to fully identify this Mr. Rodriguez." *Id.*

Oklahoma City police detective Sgt. Stark arrived sometime later with his drug dog. After speaking briefly with Officer McMullen, Sgt. Stark placed the dog on a six foot leash and it began an exterior sniff of the vehicle.[2] The dog began at the passenger front headlight and worked counterclockwise around the car, with no reaction. As he approached the open right front passenger door, the dog's behavior began to change. As explained by his handler, the changes were significant as they reflected the dog was beginning to get the scent of narcotics. Immediately after Sgt. Stark observed the change in behavior, the dog jumped

---

[2]*Sgt. Stark could not recall how long it took him to arrive after he was called. Doc. #59, pp. 72-73.*

inside the vehicle. Once inside, the dog sniffed the center console, jumped between the two front seats into the back seat, turned around, continued sniffing the center console area and then sat in the back seat facing forward. Sitting was the dog's final defined response or his "alert" to the odor of narcotics. Sgt. Stark removed the dog from the car, had him continue searching around the vehicle, reported the alert to Sgt. McMullen and left the scene.

Based on the canine alert, Sgt. McMullen searched the vehicle for drugs and found, under the cup holder, a large bag with money and a substance that field-tested positive for heroin. After the money and substance were discovered, Sgt. McMullen arrested Rodriguez.

A few minutes later the owner of the mechanic shop came out and informed Sgt. McMullen that Mr. Chavira-Serrano had been the driver of the Toyota and he was getting ready to drive away in a pickup. Sgt. McMullen stopped Mr. Chavira-Serrano and arrested him. Sgt. McMullen testified that Mr. Chavira-Serrano did not speak English.

Defendants Rodriguez and Chavira-Serrano were interviewed individually the Tuesday afternoon following their arrest. The interviews were conducted at the Oklahoma County Jail by Drug Enforcement Administration ("DEA") Special Agent Kenneth Healy, Patty Figueroa, a task force officer with DEA, who spoke Spanish,[3] and two investigators with the Oklahoma City Police Department.[4] Mr. Rodriguez was interviewed first. When asked by Agent Healy if he understood English, Mr. Rodriguez said he was more

---

[3] *Spanish was Agent Figueroa's primary language until she started school. She used Spanish in her work with both the DEA and the Oklahoma Bureau of Narcotics.*

[4] *There were four individuals because the investigation was a joint Oklahoma City/DEA investigation.*

comfortable speaking Spanish.  Agent Healy handed Officer Figueroa his yellow Miranda card for her to read Mr. Rodriguez his Miranda rights in Spanish, which she did.  The card has the Miranda warnings printed in English on one side and Spanish on the other.  Agent Healy observed her reading from the card to Mr. Rodriguez in Spanish.  Mr. Rodriguez gave no indication he did not understand and indicated affirmatively that he was willing to talk to the agents.  Agent Figueroa was used as an interpreter during the interrogation.  Special Agent Healy stated that the DEA routinely relied on Agent Figueroa's Spanish language skills.

The same procedure was used during defendant Chavira-Serrano's interview, which lasted approximately an hour.  Agent Figueroa read Mr. Chavira-Serrano his Miranda rights in Spanish and acted as the interpreter during his interrogation.  The waivers for both defendants were oral. Agent Healy testified that he always had the Miranda cards with him, but did not ordinarily have written waiver forms.  Both defendants waived their rights and proceeded to cooperate with the agents and provide information about their heroin-related activities in the Oklahoma City.

## Discussion

Each defendant's motion is addressed separately because "'Fourth Amendment rights are personal and cannot be claimed vicariously.'"    United States v. Eckhart, 569 F.3d 1263, 1274 (10th Cir. 2009) (quoting United States v. Valdez Hocker, 333 F.3d 1206, 1208 (10th Cir.2003)).

Defendant Rodriguez

Defendant Rodriguez argues that the evidence seized from the vehicle should be suppressed because of a mistake in the probable cause affidavit underlying the criminal complaint that was filed in this case. Agent Healy had stated in his affidavit that the defendants were arrested subsequent to a traffic stop. However, he admitted during the evidentiary hearing that he mistakenly used the term "traffic stop," rather than "Terry stop,"[5] and defendant fails to make a plausible argument as to why, because of the error, he is entitled have the evidence seized from the Toyota suppressed. The court found Agent Healy's explanation to be credible and the error is of no consequence to the determination here.

Defendant Rodriguez's principal argument is that the vehicle search was illegal because he was unconstitutionally detained. Even though Mr. Rodriguez does not claim a possessory or property interest in the Toyota, he may still "contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of [his] illegal detention." United States v. Mosley, 743 F.3d 1317, 1322-23 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 184 (2014). To suppress the evidence seized from the Toyota and the statements he later made "as the fruit of his unlawful detention, [defendant] must make two showings: (1) 'that the detention did violate his Fourth Amendment rights'; and (2) that there is 'a factual nexus between the illegality and the challenged evidence.'" United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001) (quoting United States v. Nava-Ramirez, 210 F.3d

---

[5]Terry v. Ohio, 392 U.S. 1 (1968).

1128, 1131 (10th Cir. 2000)); Mosley, 743 F.3d at 1323.

In his brief, Mr. Rodriguez argues that he was "detained without probable cause or any justifiable suspicion by Office McMullen for almost thirty (30) minutes even after a search of his person revealed no contraband or weapons." Doc. #49, p. 4. At the hearing, defendant went a step further and contended Sgt. McMullen lacked the authority to even approach the vehicle once he had passed the Toyota a second time and determined the occupant was not engaged in an act of prostitution. The latter argument ignores Supreme Court precedent.

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification . . . —provided they do not induce cooperation by coercive means. If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.

United States v. Drayton, 536 U.S. 194, 200 (2002) (internal citations omitted).

Assuming the initial conversation and perhaps even Mr. Rodriguez's stepping out of the vehicle and the pat down were consensual, the court concludes his placement in the police car was not.[6] At that point Mr. Rodriguez was "seized" within the meaning of the Fourth Amendment, as a reasonable person in his position would not have felt free to leave. *See* Brendlin v. California, 551 U.S. 249, 254 (2007) ("A person is seized by the police and

---

[6]*It is unnecessary for present purposes to determine the exact point at which Mr. Rodriguez was seized.*

8

thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied.") (emphasis deleted; internal quotation marks and citations omitted).

Although he spoke some English, it was not Mr. Rodriguez's preferred language. He had been approached by two police officers in separate marked vehicles, one with activated lights, as he was sitting in a car on a city street. Sgt. McMullin rapped on the window and directed Mr. Rodriguez to put his hands where the officer could see them. He was asked or directed to get out, frisked and then placed in a locked police car for more than twenty minutes. Sgt. McMullin did not tell Mr. Rodriguez that he could end the discussion at any time or that he could get out of the vehicle. A reasonable person in Mr. Rodriguez's position would not have felt free to get up and leave. *See* Brendlin, 551 U.S. at 257 ("We think that in these circumstances any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission.").

However, the court agrees with the government that, at least initially, the totality of the circumstances justified a Terry stop to allow the officers to investigate further. Mr. Rodriguez's movements in the vehicle, combined with his nervousness and the fact that he did not at first furnish a name and did not have any identification, provided Sgt. McMullen with reasonable suspicion to detain Mr. Rodriguez while he attempted to identify him. *See* Mosley, 743 F.3d at 1328 ("We have held '[f]urtive movements, nervousness, and the fact

that the conduct occurs in an area known for criminal activity are all appropriate factors to consider in determining whether reasonable suspicion exists.'") (quoting United States v. DeJear, 552 F.3d 1196, 1201 (10th Cir. 2009)). The question is whether the Terry stop went on too long. A Terry stop must be both justified at it inception and of reasonable duration. United States v. Burleson, 657 F.3d 1040, 1045 (10th Cir. 2011). In order for Mr. Rodriguez's continued "detention to be 'reasonable' for Fourth Amendment purposes – it falls to the government to show that it had reasonable suspicion to believe criminal activity may be afoot." United States v. Ludwig, 641 F.3d 1243, 1248 (10th Cir. 2011). *See* Burleson, 657 F.3d at 1045 ("Under Terry, an investigatory stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" ) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)).

In Ludwig the Tenth Circuit considered whether "a particularized and objected basis existed for suspecting [the defendant] of drug trafficking – thus permitting officers to detain him while a drug dog was deployed around the outside of his car." Ludwig, 641 F.3d at 1250. There the defendant did not stop after the trooper signaled him to pull over; the trooper noticed an overpowering smell of cologne when the defendant rolled down his window (drug couriers often used strong masking odors to hide illegal drugs); the defendant was driving a vehicle registered to a third party who was not present (under Tenth Circuit precedent this was a factor often held as a indication of drug trafficking); the defendant's account of his travel was suspect; and he was "exceptionally nervous throughout the encounter." *Id.* at 1249.

Here, in stark contrast to Ludwig, after further investigation basically all Sgt. McMullin had was what he described as furtive hand movements, no drivers license, and no additional background information on Mr. Rodriguez, though he had been provided a name, address and date of birth. Sgt. McMullen testified that when Sgt. Stark showed up and "asked what I had," that I explained to him that I could not "identify this guy" and he was making "some stuffing movement, some movements normal people don't make when I'm on approach." Doc. #59, p. 18. While Rodriguez was initially nervous, Sgt. McMullin did not testify that he remained so. And the Tenth Circuit has "emphasized – repeatedly – that 'nervousness is of limited significance in determining reasonable suspicion.'" *Id.* at 1249-50 (quoting United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1977)). *See* United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001) (noting that, while limited significance is attributed to nervousness when determining whether reasonable suspicion exists, "[e]xtreme and continued nervousness, however, is entitled to somewhat more weight") (emphasis added) (internal quotation marks omitted).

Sgt. McMullin ran a tag check on the vehicle and no illegality surfaced. He ran Mr. Rodriguez's name and address through the VARUNA system and came up with no information. While the government attempted to attach significance to that fact, it did not explain the link between the lack of information and Mr. Rodriguez's involvement in any criminal conduct, much less drug trafficking. Sgt. McMullin testified that he had not, as a result of running defendant Rodriguez's personal information through the VARUNA system,

11

learned anything suspicious about the defendant. Doc. #59, pp. 36-37.[7] In other words, his suspicions were not validated.

On the other hand, Mr. Rodriguez had given a plausible story, that he was waiting on a friend who was picking up a vehicle at a shop across the street, which Sgt. McMullin testified appeared to be open. While Mr. Rodriguez's friend had yet to appear, neither officer had made any effort to corroborate what they had been told. The fact that Mr. Rodriguez was not carrying a driver's license was troublesome, as it raised a concern as to how he would be able to drive the Toyota. That would not, though, contribute to a reasonable suspicion that Mr. Rodriguez was transporting or distributing drugs. Furtive movements in the car, without more, were not enough to warrant the relatively extended detention of Mr. Rodriguez for a canine search. Once he had completed the VARUNA check, the grounds for the continued detention of Mr. Rodriguez were gone. *See generally* Williams, 271 F.3d at 1271 ("Under the totality of the circumstances, we conclude that Mr. Williams' extreme nervousness, the presence of the short-range radio, and the discrepancy in the rental agreement all provided the officer with sufficient reasonable suspicion to detain Mr. Williams for the purpose of performing a canine drug search."); United States v. Lyons, 510 F.3d 1225, 1237 (10th Cir. 2007) (factors present which warranted continued detention of driver included the smell of

---

[7]*"Q. No contacts, no reason to believe he was involved in illegal activity as a result of that, correct?*
   *A. Yes, sir.*
   *Q. Is that true?*
   *A. Yes, sir."*
*Doc. #59, pp. 36-37.*

air freshener, a radar detector in the vehicle, the trooper's knowledge that the driver had a criminal history for drug possession and trafficking and his knowledge that spare tires are often used to smuggle drugs coupled with a suspicious spare tire). Further detention or questioning was not justified as the officer did not have "an objectively reasonable and articuable suspicion that [Mr. Rodriguez was] engaged in illegal activity." Lyons, 510 F.3d at 1237. "Even a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment." Burleson, 657 F.3d at 1045.

Having concluded Mr. Rodriguez has satisfied the first prong of the DeLuca test, the question then becomes whether a factual nexus exists between his unlawful detention and the discovery of the drugs and money in the vehicle. The court concludes the necessary connection exists, as – "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." DeLuca, 269 F.3d at 1132 (internal quotation marks omitted).

It can reasonably be assumed that if Mr. Rodriguez had been released, he would have returned to the car and shut the door. When Mr. Rodriguez exited the vehicle it was running. If he had returned to the Toyota to wait for Chavira-Serrano, he would have shut the door in light of the August heat. Even if he had instead walked over to the mechanic's shop or simply walked away, it seems likely he would have stopped by the vehicle long enough to shut the door. And, based on Sgt. Stark's testimony, without the open door the drugs would not have been discovered. He testified that there were no changes in the dog's behavior until he approached the open passenger door. If the dog had been able to detect the odor with the

car door closed, his behavior would presumably have changed when he passed by the driver's door, as it was equidistant from the area under the cupholder where Sgt. McMullen found the bag with the currency and heroin. But his behavior did not change at that point. It was not until Sgt. Stark and the dog had worked their way around the car, past the driver's door to the open passenger door, that the dog reacted.[8]

As there is a factual nexus between Mr. Rodriguez's detention and the evidence found in the Toyota, the evidence must be suppressed unless the government proves it is not "'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." United States v. Nava-Ramirez, 210 F.3d at 1128, 1131 (10th Cir. 2000). No such showing was made nor could it likely have been under the facts present here. The officers lacked reasonable suspicion to detain Mr. Rodriguez further, much less probable cause to search the vehicle. The Toyota was properly parked on the street and there was no apparent basis to impound the vehicle or arrest either defendant.[9]

This case is distinguishable from others, such as Nava-Ramirez and Deluca, in which defendants sought to challenge evidence found in vehicles as the fruit of their own unlawful

---

[8]*While the dog's behavior changed while he was outside the vehicle, it was not until he was inside the Toyota that he gave his "final response," which was to sit. Doc. #59, p. 72. Sgt. Stark testified that "the change in behavior is the alert. The final response combined with that, the sitting is the final response." Id.*

[9]*The government did not assert that there were outstanding warrants for either Mr. Rodriguez or Mr. Chavira-Serrano.*

14

detention. There, the factual nexus required a showing that the defendants would have been able to leave in the vehicles in which the evidence was found. That would have been improbable here, since Mr. Rodriguez did not have a driver's licence. Here, however, it was not necessary for the vehicle to be driven away to establish the nexus between Mr. Rodriguez's detention and the evidence found in the Toyota. Rather, given the circumstances in which the dog did and did not alert, it was necessary only that Mr. Rodriguez's conduct upon release involve shutting the door.

As the court has concluded that the Mr. Rodriguez's prolonged detention was unlawful and that a factual nexus exists between his detention and the evidence seized from the Toyota, that evidence and the incriminating statements he subsequently made – both "fruit of the poisonous tree" – will be suppressed.

Defendant Chavira-Serrano

"The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search."[10] Eckhart, 569 F.3d at 1274 (internal quotation marks omitted). Defendant Chavira-Serrano did not do this. Instead, he relied on the violation of Mr. Rodriguez's Fourth Amendment rights as a basis to suppress the evidence seized from the Toyota. He did not show how his own Fourth Amendment rights were violated by the search of the vehicle. His motion,

---

[10]*Although Mr. Chavira-Serrano never indicated what his interest was in the car which allowed him to challenge its search, the government conceded in its brief that he was the owner of the vehicle. Doc. #55, p. 8. See Valdez Hocker, 333 F.3d at 1209 ("To establish standing to challenge a car search, the defendant bears the burden of showing that he had a legitimate possessory interest in or [a] lawful control over the car.") (internal quotation marks omitted).*

directed to the evidence seized from the Toyota fails, because the search, which was based on probable cause, was lawful as to him.

"A dog sniff of the exterior of a vehicle parked in a public place does not require reasonable suspicion because it is not a Fourth Amendment intrusion." United States v. Engles, 481 F.3d 1243, 1245 (10th Cir. 2007). The dog's entry into the car through the open car door was valid as it was not facilitated by either Sgt. Stark or Sgt. McMullin.[11] *See* Felders *ex rel*. Smedley v. Malcom, 755 F.3d 870, 885 (10th Cir. 2014), *petition for cert. denied,* 83 USLW 3438 (U.S. Jan. 12, 2015) (No. 14-533). It was Mr. Rodriguez, not the officers, who opened the car door. Once the dog alerted to the console area, the officers had probable cause to search the vehicle. *Id.* at 880*; see* Engles, 481 F.3d at 1245 ("It is undisputed that once the dog alerted to the trunk and side door, the officers had probable cause to search the car and its contents."). Defendant Chavira-Serrano's motion will be denied insofar as he seeks to suppress the evidence seized from the Toyota. That decision does not, however, preclude him from challenging the admissibility of the statements he made later when interrogated by the agents.

The government bears the burden of establishing the validity of defendant Chavira-Serrano's waiver of his Miranda rights by a preponderance of the evidence. United States v. Gell-Iren, 146 F.3d 827, 830 (10th Cir. 1998). It must " prove that a defendant's waiver

---

[11]*Mr. Chavira-Serrano's assertion at the hearing that Sgt. McMullin facilitated the opening of the car door and the dog jumping into the vehicle by asking Mr. Rodriguez to exit the car is not supported by case law. If the officer had prevented Mr. Rodriguez from closing the door or had himself opened it, that would be a different situation, but that did not occur.*

was voluntary in the sense that it was a product of a free and deliberate choice rather than intimidation, coercion, or deception, and that the defendant had a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotation marks omitted). As the court stated at the hearing, based on the evidence introduced, the government met its burden. Special Agent Healy was a credible witness and defendants offered no evidence contradicting his testimony.

Mr. Chavira-Serrano was advised of his rights in Spanish, which he then orally waived. While a written waiver would have provided additional evidence of the waiver, it is not required for the government to establish that the waiver did, in fact, occur. *Id.* ("Where a defendant's actions clearly demonstrate that he has voluntarily waived his Miranda rights, his failure to sign a waiver of rights form does not render his waiver involuntary."). Similarly, although the use of a certified interpreter might be preferred, it is not required for there to be an effective waiver. *See generally* United States v. Silva-Arzeta, 602 F.3d 1208, 1217 (10th Cir. 2010) ("We can agree with Mr. Silva–Arzeta that the use of certified interpreters and recording devices during interrogation could improve the accuracy of evidence at trial. We cannot, however, hold that their use is constitutionally required."). Also, contrary to defendant's argument, the fact that Agent Figueroa was a non-independent Spanish-speaking law enforcement officer does not necessarily make her a biased interpreter. *See id.* at 1216.

While Mr. Chavira-Serrano may not have been aware of his constitutional rights in this country before he was arrested, he was informed of them before he was interrogated.

The interrogation was not lengthy and there was no evidence of the use or threat of physical force or of any coercion.[12] Defendant Chavira-Serrano's oral waiver of his Miranda rights was made voluntarily, knowingly and intelligently and was therefore valid, see United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010), and his subsequent incriminating statements were voluntary. Defendant Chavira-Serrano's motion to suppress will be denied as to the statements he made after his arrest.

Accordingly, defendant Rodriguez's motion to suppress [Doc. #49] is granted. The evidence seized from the Toyota and statements Mr. Rodriguez made when interviewed after his arrest will be suppressed. Defendant Chavira-Serrano's motion to suppress [Doc. #51] is denied.

The court is mindful of the somewhat anomalous nature of the result here, given the common set of facts out of which the defendants' arrests arose and the similarities in their positions. However, their circumstances are not identical. Constitutional rights are personal, not vicarious or derivative, and, as indicated above, their application in this case leads to different results for different defendants.

**IT IS SO ORDERED**.

Dated this 2nd day of February, 2015.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[12]Although the government did not establish Mr. Chavira-Serrano's age or education level, it was visibly apparent that both he and Mr. Rodriguez were, at a minimum, young adults.